IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


WYON DALE CHILDERS,
      Petitioner,

vs.                               Case No.: 3:07cv243/LAC/EMT

WILLIE FLOYD, WARDEN,
      Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1, Petition). Respondent filed an answer and relevant portions of the state court record (Docs. 6, 8). Petitioner filed a reply (*see* Doc. 17). Petitioner has also filed a motion to expedite the proceedings and supplement the record (Doc. 20), to which Respondent has filed a response in opposition (Doc. 21), and Petitioner has filed a reply (Doc. 25).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.     PROCEDURAL HISTORY

      The relevant aspects of the procedural history of this case are established by the state court record (Doc. 8). Petitioner was originally indicted on June 17, 2002, in the Circuit Court for Escambia County, Florida, on one count of money laundering, one count of bribery, and one count of unlawful compensation or reward for official behavior (*id.*, Ex. A at 1–3). At the request of the

defense, venue was changed to Okaloosa County Florida (*id.* at 12–30, 159–60, 162–66).  On March 31, 2003, the State filed an amended information charging Petitioner with the same offenses but adding more facts (*id.* at 6–7).  Following a jury trial, Petitioner was found guilty of the bribery and unlawful compensation counts, and not guilty of the money laundering count (Doc. 8, Ex. B, verdict at 692).  Petitioner was sentenced to forty-two (42) months of incarceration (Doc. 1 at 1).  Petitioner appealed the judgment of conviction and sentence to the Florida First District Court of Appeal (First DCA), and the appellate court affirmed on February 2, 2006 (Doc. 8, Ex. M).  Childers v. State, 936 So. 2d 585 (Fla. 1st DCA 2006) (en banc) (per curiam).  Petitioner filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court, but the state supreme court declined jurisdiction (Doc. 8, Ex. U).  Childers v. State, 939 So. 2d 1057 (Fla. 2006).

Petitioner filed the instant habeas action on December 14, 2006 (Doc. 1).  Respondent concedes that the petition is timely (Doc. 6 at 10).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts

---

[1] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion."  Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28

U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, --- U.S. --- 127 S. Ct. 2842, 2858, --- L. Ed. 2d --- (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

III.    BACKGROUND AND PRE-TRIAL PROCEEDINGS

A summary of the background and pre-trial proceedings that are relevant to Petitioner's claim is a necessary component of the court's review.  A grand jury initially returned an indictment against Petitioner charging him with one count of money laundering, one count of bribery, and one count of unlawful compensation or reward for official behavior (Doc. 8, Ex. A at 1–3).  At the time of the alleged unlawful activity, both Petitioner and Willie Junior served as Escambia County Commissioners (*see id.*).  The State alleged that Petitioner made a series of payments to Mr. Junior in return for Mr. Junior's vote in favor of acquiring the Pensacola Soccer Complex (*id.*).  According to the State, Petitioner and Mr. Junior stood to receive kickbacks from the owner of the soccer

complex, Mr. Joe Elliot, upon the County's purchase of the property.  Mr. Elliot, Mr. Junior, Petitioner, and others faced criminal charges as a result of these allegations.

In June of 2002, several months before either Mr. Elliot or Petitioner went to trial, Mr. Junior entered into a plea agreement with the State (Doc. 8, Ex. C at 1010–16).  Under the terms of his plea agreement, Mr. Junior agreed to plead nolo contendere to numerous charges, including bribery, extortion, grand theft, and racketeering, and he agreed to testify truthfully in any criminal prosecution against any defendant in which he was called to testify (*id.* at 1014–16).  Mr. Junior also agreed, under the plea agreement, to cooperate with the State in their investigation and fully inform the State and the grand jury of any and all criminal offenses committed by him or others of which he had knowledge (*id.*).  In exchange, the State agreed that if Mr. Junior complied with the terms of the plea agreement, he would be granted immunity from prosecution for any offenses, other than the charges encompassed by the plea agreement and excluding certain types of crimes, relating to statements made or documents produced in relation to the grant of immunity (*id.*).  Additionally, the State agreed that it would "recommend a sentence no greater than eighteen months state prison," rather than the approximately 125-year maximum sentence that Mr. Junior faced (*id.*).  The State reserved the right to file a substantial assistance motion recommending a departure from the sentencing guidelines or reduction of sentence based on its determination that Mr. Junior had "provided substantial assistance in the investigation or prosecution of other persons who have committed offenses" (*id.*).  The agreement vested the State Attorney with "sole discretion" to determine whether Mr. Junior provided this assistance and whether circumstances existed to revoke the plea agreement, including Mr. Junior's refusal to cooperate, providing incomplete or untruthful statements or testimony, or failure to otherwise comply with the terms of the agreement (*id.*).

Mr. Junior testified against Mr. Elliott at Mr. Elliott's trial in December of 2002 (Elliott trial). During that trial, the defense attacked Mr. Junior's credibility.  The jury ultimately acquitted Mr. Elliott of charges related to the Pensacola Soccer Complex transaction.  In January of 2003, after the acquittal in the Elliott trial, Mr. Junior met with a state investigator and provided new facts which suggested culpability on Petitioner's part regarding the bribery scheme (*see* Doc. 8, Ex. C at 1017–24).

After Mr. Junior provided this new information, the State filed a "Notice of Revocation of Terms of Plea Agreement" in Mr. Junior's criminal case (Doc. 8, Ex. C at 1017–24). The State asserted that Mr. Junior had failed to comply with the plea agreement by failing to fully cooperate with the State and making several incomplete or untruthful statements (*id.*).  As grounds for seeking revocation, the State asserted that throughout the initial investigation, Mr. Junior had maintained that there was no conversation between he and Petitioner at the time Petitioner wrote "100/100" on a notepad and passed it to Mr. Junior, but Mr. Junior assumed the note meant that they would each receive $100,000 if the Pensacola Soccer Complex deal was approved, but in his January of 2003 statements to the State Attorney's Office, Mr. Junior disclosed for the first time that the passing of the note was accompanied by Petitioner's statement that "if the soccer complex goes through, it will be a hundred for you and a hundred for me" (*see id.* at 1018– 20).  The State further asserted that prior to January of 2003, Mr. Junior maintained that the "100/100" note incident occurred after October 4, 2001, when the County Commission voted to appraise the Soccer Complex property, but before November 1, 2001, when the Commission voted to purchase the property, but in his January of 2003 statements, Mr. Junior stated that Petitioner gave him the note before the appraisal vote on October 4, 2001 (*id.* at 1020).  In Mr. Junior's January of 2003 statements, he stated for the first time that Petitioner stated, after the "100/100" note incident and before the October 4, 2001 vote, that he was going to send Mr. Elliot to see Mr. Junior (*see id.* at 1020).

Similarly, Mr. Junior's statements in January of 2003 provided previously absent details concerning an incident during which Petitioner gave Mr. Junior a large cooking pot filled with money (*see* Doc. 8, Ex. C at 1020).  Prior to January of 2003, Mr. Junior had maintained that Petitioner gave him a pot full of money, but there was no conversation during the incident (*see id.* at 1020–21).  On January 17, 2003, however, Mr. Junior recalled that Petitioner mentioned that he took $25,000 out of the pot, and on January 31, 2003, Mr. Junior stated that when Petitioner gave him the pot, Petitioner stated he had taken out $10,000 and another $25,000 (*see id.* at 1021).

In January 2003, Mr. Junior also recalled for the first time that Petitioner stated he was "sick and tired of not being able to get three votes" (Doc. 8, Ex. C at 1020, 1022).  During the January meetings, Mr. Junior first stated that Petitioner had made this statement as early as May 2001 (*see*

*id.* at 1022). When questioned further about this new information, Mr. Junior recalled that Petitioner made the statement during the "100/100" note incident (*see id.*).

The State concluded its Notice of Revocation by stating:

> Mr. Junior has failed to disclose, in a timely manner, relevant, crucial and material information needed by the State of Florida in preparation of its cases, and thus, has provided inconsistent statements as to key events. Such failures and/or inconsistencies have resulted in damage to the State of Florida's prosecution of various defendants.

(*see* Doc. 8, Ex. C at 1024).

The trial court granted a hearing on the State's Notice of Revocation, at which Mr. Junior's counsel argued that Mr. Junior had substantially complied with the terms of the plea agreement (*see* Doc. 8, Ex. C at 511–62). The trial court determined that Mr. Junior substantially complied with the plea agreement, and the State had no basis to revoke it (*id.* at 526). Therefore, the court set aside the State's Notice of Revocation (*id.*).

Following the trial court's ruling on the Notice of Revocation, the State replaced the original indictment against Petitioner with an information which included the additional information provided by Mr. Junior in January of 2003 (*see* Doc. 8, Ex. A at 4–5). The State subsequently amended the information and charged Petitioner with one count each of money laundering, bribery, and unlawful compensation or reward for official behavior (*id.* at 6–7). Count I alleged that Petitioner, on December 5, 2001, laundered $40,000.00, the proceeds of a bribe, through Willie Junior (*id.*). Count II alleged that Petitioner, between June 1, 2001, and November 1, 2001, bribed Willie Junior with the promise of receiving $100,000 in exchange for Junior's favorable vote (*id.*). Count III alleged that Petitioner, between November 24, 2001, and February 21, 2002, unlawfully compensated or rewarded Willie Junior for his official behavior, by paying him at least $40,000.00 (*id.*).

Prior to Petitioner's trial, he filed a Notice of Intent to Use Party Opponent Statements, stating that the defense intended to present the State's Notice of Revocation of Mr. Junior's plea agreement and party opponent statements (by the State Attorney) from the hearing on the Notice of Revocation, as well as party opponent statements (by the State Attorney) from the Elliott trial (*see* Doc. 8, Ex. A at 646–47). Petitioner also filed a Motion In Limine To Exclude Court Ruling, seeking to exclude any mention, comment, or reference to the trial court's ruling on the State's

Notice of Revocation of Mr. Junior's plea agreement (*see id.* at 642–43).  Petitioner argued that the order finding that Mr. Junior had complied with the plea agreement was irrelevant and would constitute "improper bolstering" (*id.*).  In addition, Petitioner argued that the order's "probative value, if any, is substantially and overwhelmingly outweighed by the unfair prejudice" (*id.*).  Thus, Petitioner sought to have the jury hear only the State's accusations that Mr. Junior's later statements were not truthful and complete, and not the judicial ruling finding that Mr. Junior had substantially complied with the terms of the plea agreement, and therefore, the State had no basis to revoke the agreement.

During a pre-trial proceeding on March 31, 2003, the parties argued the defense's motion to exclude any evidence regarding the trial court's ruling on the State's Notice of Revocation of Mr. Junior's plea agreement (*see* Doc. 8, Ex. B at 103–06).  The court granted the defense's motion, thereby excluding evidence of the court's ruling on the ground that this evidence was irrelevant to the State's case (*id.* at 118).  The court also ruled that exclusion of the Notice of Revocation itself was warranted, thereby precluding the defense from introducing the State's Notice of Revocation, on the ground that if the State's attempt to revoke the agreement was admitted, the State would be allowed to establish that the judge found Mr. Junior in compliance with the plea agreement (*see id.* at 118, 121–23).  With regard to the defense's use of party opponent statements from the hearing on the Notice of Revocation, the parties agreed to address the issue during trial via the defense's proffering the statements and the parties arguing the admissibility of the statements at that time (*see id.* at 57–61).

Also during the pre-trial proceeding on March 31, 2003, the parties argued the State's motion in limine seeking to exclude any mention, argument, or evidence of the verdict in the Elliott trial (*see* Doc. 8, Ex. A at 568–69; Doc. B at 62–81).  The court granted the State's motion, thereby excluding the verdict in the Elliott case on the ground that "among other things . . . , the prejudice would outweigh any probative value" (*see id.* at 117–18).

Petitioner's jury trial commenced on April 1, 2003, and concluded on April 9, 2003 (*see* Doc. 8, Ex. B).  A summary of the relevant trial testimony will be provided in the discussion of Petitioner's claim, *infra*.

IV.    PETITIONER'S CLAIM

"A defendant's Constitutional rights to confront the witnesses against him and to present his defense through cross-examination of a prosecution witness may not, consistent with the Federal Constitution, be curtailed solely because it would 'unfairly prejudice' the State."

Petitioner claims that the trial court denied his Sixth Amendment right to confront the State's "star witness," Willie Junior, by foreclosing the defense's efforts to show Mr. Junior's bias and motive by cross-examining him with the following evidence:  (1) the "not guilty" verdict in the Elliott trial wherein Willie Junior was the State's key witness, and (2) the Notice of Revocation filed by the State in Willie Junior's case and portions of the transcript from the hearing on the State's Notice, specifically, statements by the State Attorney regarding the State's reasons for seeking revocation of Willie Junior's plea agreement (*see* Doc. 1, Petition at 6, Supporting Memorandum at 2–3, 12, 19–20).  The defense intended to use this information to cross-examine Mr. Junior about his related testimony in the Elliott trial, which resulted in an acquittal, and his changed statements that caused the State to file the Notice of Revocation of his plea, in an attempt to show that Mr. Junior had a motive to bolster his story at Petitioner's trial (*see id.*).  Petitioner argues that the limitation imposed by the trial court prevented the jury from learning about Mr. Junior's motivation in forming his testimony, specifically, that Mr. Junior was motivated to bolster his story by the acquittal in the Elliott trial and the State's seeking to revoke his plea agreement (*see* Doc. 1, Supporting Memorandum at 2–3, 12, 19–20; Doc. 17 at 9).  Petitioner additionally contends that the limitation actually misled the jury about Mr. Junior's credibility in that Mr. Junior acknowledged on the stand that the State had the power to revoke his plea agreement if he was untruthful, but because the State in fact did not have that power—given that the trial judge was able to block that effort—the jury was misled to believe that the State believed Mr. Junior was "telling the same story" at Petitioner's trial that he had told at the Elliott trial (*see* Doc. 1, Supporting Memorandum at 3; Doc. 17 at 9–10).  Petitioner contends that the trial court's preclusion of this evidence was contrary to clearly established Supreme Court law (Doc. 1, Supporting Memorandum at 16, 24), and the First DCA's determination that preclusion of the evidence was proper, though on different grounds than relied upon by the trial court, was constitutionally impermissible (*id.* at 17, 24).

Respondent contends Petitioner is not entitled to federal habeas relief on his claim for two reasons.  First, Petitioner's challenge to the trial court's evidentiary ruling and the appellate court's

utilization of the "tipsy coachman" doctrine to find that the evidence was properly excluded for another reason, does not present a federal issue, rather, it presents a state law claim that the state courts misapplied state law and rules regarding the admissibility of evidence (Doc. 6 at 10–13). Second, Petitioner failed to establish that the state court decision denying his claim was contrary to or an unreasonable application of Supreme Court precedent (*id.* at 13, 29, 33).

Upon independent review of the merits of Petitioner's constitutional claim, the undersigned concludes that he has failed to demonstrate a constitutional violation. "In all prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. A primary interest secured by the Confrontation Clause is the opportunity for cross-examination. *See* Crawford v. Washington, 541 U.S. 36, 41–42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); Olden v. Kentucky, 488 U.S. 227, 231, 109 S. Ct. 480, 483, 102 L. Ed. 2d 513 (1988); Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974); Kentucky v. Stincer, 482 U.S. 730, 736, 107 S. Ct. 2658, 2662, 96 L. Ed. 2d 631 (1987); United States v. Williams, 837 F.2d 1009, 1015 (11th Cir. 1988). "Exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Davis, 415 U.S. at 316–17 (citing Greene v. McElroy, 360 U.S. 474, 496, 79 S. Ct. 1400, 1413, 3 L. Ed. 2d 1377 (1959)). Defense counsel must be able "to make a record from which to argue why [a witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id.* at 318. He must be "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.*

The defendant's right to cross-examine witnesses is not without limitation, however. He is entitled to only an opportunity for effective cross-examination, not cross-examination "in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 294, 88 L. Ed. 2d 15 (1985) (per curiam); United States v. Beale, 921 F.2d 1412, 1424 (11th Cir. 1991). "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435, 89 L. Ed. 2d 674 (1986); *see*

*also* <u>United States v. Bennett</u>, 928 F.2d 1548 (11th Cir. 1991); <u>Francis v. Dugger</u>, 908 F.2d 696 (11th Cir. 1990).  "[W]here the witness sought to be cross-examined is the government's 'star' witness, providing an essential link in the prosecution's case, the importance of full cross-examination to disclose possible bias is necessarily increased." <u>United States v. Lankford</u>, 955 F.2d 1545, 1548 (11th Cir. 1992).  Thus, the discretion of a trial judge to limit cross-examination is more narrowly circumscribed in such cases.  *See* <u>De Lisi v. Crosby</u>, 402 F.3d 1294, 1301 (11th Cir. 2005) (citation omitted).

Cross-examination is constitutionally adequate as long as a defendant is permitted to elicit sufficient information from which (1) the jury can gauge credibility, motive, and bias and (2) his counsel is able to argue to the jury how the witness might have been biased.  <u>United States v. Van Dorn</u>, 925 F.2d 1331, 1335 (11th Cir. 1991); <u>United States v. Sellers</u>, 906 F.2d 597, 602 (11th Cir. 1990); <u>Bundy v. Dugger</u>, 850 F.2d 1402 (11th Cir. 1988).  The standard in reviewing a limitation upon cross-examination is whether "the excluded testimony would have given the jury a different impression of the witness' credibility." <u>United States v. DeParias</u>, 805 F.2d 1447, 1452 (11th Cir. 1986).

The right to present a defense through confrontation and cross-examination of witnesses is also guaranteed by constitutional principles of due process.  "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.  The rights to confront and cross-examine witnesses . . . have long been recognized as essential to due process." *See* <u>Chambers v. Mississippi</u>, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

Analysis of whether constitutional error occurred during trial does not end the inquiry, however.  Error involving the conduct of trial is grounds for federal habeas relief only if it "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637–38, 113 S. Ct. 1710, 1722, 123 L. Ed. 2d 353 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S.750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 2d 1557 (1946)).  Because the erroneous exclusion of evidence occurred "during the presentation of the case to the jury, [the error can be] quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial." <u>Brecht</u>, 507 U.S. at 629 (internal citations and quotation

marks omitted).  Should the court's limitation of cross-examination constitute error, such error may be harmless depending upon the following five factors:  (1) how important the witness's testimony was to the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted;  and (5) the overall strength of the prosecution's case.  *See* Van Arsdall, 475 U.S. at 684; United States v. Mills, 138 F.3d 928 (11th Cir. 1998).

"[W]here a judge, in a habeas proceeding, applying this standard of harmless error, is in grave doubt as to the harmlessness of an error, the habeas petitioner must win."  California v. Roy, 519 U.S. 2, 5, 117 S. Ct. 337, 338, 136 L. Ed. 2d 266 (1996).  The Supreme Court has defined grave doubt as, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."  O'Neal v. McAninch, 513 U.S. 432, 435, 115 S. Ct. 992, 994, 130 L. Ed. 2d 947 (1995).

At Petitioner's trial, Willie Junior testified as a witness for the State (Doc. 8, Ex. B at 575). He testified that he was a County Commissioner for Escambia County for eighteen (18) years (*id.* at 576), and that he had been charged with various crimes resulting from his activities as a County Commissioner (*id.* at 578).  He testified that he entered into a plea agreement whereby he agreed to plead no contest to the charges in exchange for maximum sentence exposure of eighteen (18) months (*id.* at 579).  He further testified that Petitioner became a County Commissioner in 2000 or 2001 (*id.* at 580).  Mr. Junior testified that on May 31, 2001, he went to Petitioner's office, and Petitioner mentioned that he was "sick and tired of trying to get three votes" and would like to try to get some things done (*id.* at 582–83).  Mr. Junior testified that he asked Petitioner for $10,000.00, and Petitioner wrote out a check and gave it to him (*id.* at 583).  Mr. Junior identified a check dated May 31, 2001, made payable to him in the amount of  $10,000.00 and authored by Petitioner (*id.* at 581–82).  He testified that although the memo line stated "Ruth" and referred to six months at eight percent, there was no discussion about his paying back the funds to Petitioner (*id.* at 584–85).  Mr. Junior testified that he exchanged the check for a cashier's check and deposited the cashier's check (*id.* at 585).

Mr. Junior further testified that between August and September of 2001, he met Petitioner at Petitioner's office (*id.* at 586).  He testified that he and Petitioner went to a conference table, and

Petitioner wrote "100,000/100,000" on a legal pad and stated he and Mr. Junior would each receive "a hundred" (*id.* at 588).  Mr. Junior testified that he believed the note represented that he would receive $100,000 and Petitioner would receive $100,000 if the County's purchase of the Pensacola Soccer Complex was completed (*id.* at 634–35).

Mr. Junior also testified that he met Joe Elliott in 2001 (Doc. 8, Ex. B at 589).  Mr. Junior testified that Mr. Elliott came to his office for a meeting, and based upon that meeting, Mr. Junior added an item to the agenda of the County Commission meeting on October 4, 2001, for the county to obtain an appraisal for the possible purchase of the Pensacola Soccer Complex (*id.* at 589–93).  The Commission voted in favor of the appraisal (*id.* at 593).  Mr. Junior testified that after County staff obtained the appraisal, he added an item to the agenda of the Commission meeting on November 1, 2001, for the county to purchase the Pensacola Soccer Complex (*id.* at 593–95).

Mr. Junior testified that on November 24, 2001, he received a telephone call from Petitioner to come to his office (Doc. 8, Ex. B at 595).  The two men met at Petitioner's office, and during the course of the meeting, Petitioner gave Mr. Junior a pot with money in it (*id.* at 596).  Mr. Junior described the pot as a stainless steel pot, approximately 10–11 inches wide and 9–10 inches deep (*id.*).  Mr. Junior testified that during the course of the State's investigation of these matters, he went with a State investigator, Allen Cotton, to look at various pots which resembled the pot that Petitioner gave him, and Junior selected a twelve quart pot (*id.* at 596–97).  Mr. Junior identified a pot similar in size to the pot given to him by Petitioner, and the pot was admitted into evidence (*id.* at 597–98).  Mr. Junior testified that when Petitioner presented him with the pot, Petitioner said "I got 25—25 out" (*id.* at 599).  Mr. Junior testified that he received the money in the pot "for my vote on the soccer complex" (*id.* at 607).

Mr. Junior testified that he subsequently took $40,000 from the pot and took it to Petitioner in exchange for a $40,000 cashier's check, because Petitioner had told him that if he needed to exchange some of the cash for a check, he should bring Petitioner the cash, and he would exchange it for a cashier's check (Doc. 8, Ex. B at 608–09).  Mr. Junior identified a cashier's check dated December 5, 2001, in the amount of $40,000 as the check he received from Petitioner and deposited into his checking account (*id.* at 609).  Mr. Junior testified that he also received separate checks from Petitioner in the amounts of $7,000, $10,000, $3,000, $11,000, and $9,000 (*id.* at 614, 625–27, 630).

Mr. Junior additionally testified that he ultimately signed two promissory notes, on behalf of the Junior Funeral Home and himself personally, in favor of Petitioner, but Mr. Junior testified that Petitioner told him that he would not hold Mr. Junior responsible for the notes and never attempted to obtain repayment or security, and Mr. Junior never expected or attempted to pay on the notes (*id.* at 615–17, 628–30, 633).

Petitioner's counsel vigorously cross-examined Mr. Junior.  Counsel began by asking Mr. Junior whether everything he had ever said under oath was true, and Mr. Junior responded affirmatively (Doc. 8, Ex. B at 636–37).  Mr. Junior admitted that he borrowed $40,000 from a third party and failed to repay it (*id.* at 649–51).  He also testified that on April 30, 2002, he was indicted for racketeering, four counts of bribery, four counts of extortion, and grand theft (*id.* at 653–54). He testified that he learned that he was facing 125 years in prison for the crimes (*id.* at 658).  Mr. Junior testified that he had a series of meetings with prosecutors in the middle of June of 2002, during which he told them a sequence of events (*id.* at 662).  He testified that after the meetings, he gave a taped interview with investigators on June 15, 2002 (*id.* at 662–63).  Mr. Junior testified that two days after he gave the taped interview, he signed a plea agreement (*id.* at 663).

Defense counsel questioned Mr. Junior extensively about the terms of the plea agreement (Doc. 8, Ex. B at 664–72, 679–86).  Mr. Junior testified that the plea agreement provided as follows: (1) the State could not prosecute him for any other crimes he may have committed besides the crimes charged in the indictment; (2) he would provide truthful information about what he knew to the prosecutor; (3) he would testify truthfully if asked to do so; and (4) if the State believed that he had testified falsely or given false information, the immunity would disappear for other offenses he may have committed and he could be prosecuted for perjury (*id.* at 666–67).  Defense counsel continued cross-examination as follows:

> Q.    On Page 2 [of the plea agreement], tell me if I'm right, this is the agreement you signed; right?
>
> A.    That's correct.
>
> Q.    "If Junior is a witness at any trial or other hearing, including one in which Junior is charged as defendant, and Junior testifies as to any facts materially different from the statements made or other information provided earlier by Junior under this agreement"—in other words, what you had already told them at the time

you signed this agreement, in other words this is June 17th, so the story you told them was the story that they're talking about here; right?

A.     That's correct.

Q.     —"materially different from statements made or other information provided earlier by Junior under this agreement, the attorney for the state may cross-examine Junior or present impeachment evidence concerning any statement made or information provided earlier by Junior under this agreement.   This provision is necessary in order to assure that Junior does not make materially false statements to a state agency and does not commit perjury while testifying."   Right?

A.     That's what it states.

(*id.* at 668–69).   Defense counsel then questioned Mr. Junior about the negotiated sentence.  Mr. Junior testified that pursuant to the agreement, he would face a maximum sentence of eighteen (18) months in prison, but he could receive a lesser sentence, including probation with no prison time (*id.* at 670).   The agreement further provided that if he was charged and convicted of any federal offenses, the state sentence would run concurrently with the federal sentence, and Mr. Junior would serve his prison time in a federal facility (*id.* at 671–72).   Additionally, the agreement provided that adjudication could be withheld, whereby Mr. Junior would not actually be convicted of the ten felonies (*id.*).   Mr. Junior testified that the agreement provided that he would be required to submit to and successfully pass a polygraph test if the State requested him to take such test, but he had not been asked to take one (*id.* at 679).

Defense counsel then questioned Mr. Junior about telling the truth:

Q.     And we already know that you firmly and strongly believe in the oath, that if you take an oath, you need to tell the truth; right?

A.     If you take an oath, you should tell the truth, if you understand what's going on.

Q.     Could you explain that answer?

A.     Sometimes when you're asked questions in one way to answer it, the next time somebody else asks the question it's not exact, and you can't remember all this stuff that you dealt with, if you dealt with like two or 3,000 pages of depositions, and you go directly to the page.

Q.      So, in other words, if you forget what answer you gave the last time, and you give a different answer this time, that's not not telling the truth?

A.      Well, if you forget it, it's not a matter of telling the truth.  You can't respond to something that you do not remember.

Q.      Right.  And so the truth would be, "I don't remember," rather than an answer.

A.      Or I don't recall.

Q.      Right.  So, in other words, I'm assuming then that if you've given answers under oath in the past or to police that weren't, "I don't remember," but you gave an answer, that that was the truth; right?

A.      You said you were assuming that, so—

Q.      Can we all make that assumption, that anything you've said under oath has been the truth so far, or are you saying the problem is sometimes you don't remember how you answered that same question on a prior occasion, and if you give a different answer, you didn't mean to not tell the truth, it just happened?

A.      No.  It's how the question was given to you or how—what you remember about the question.

Q.      Okay.  So sometimes you don't remember the question when you give your answer?

A.      I guess we need to deal with something a little more specific.

Q.      Okay. . . . I had thought you were going to say, yeah, you should always tell the truth, and you said unless you get confused or something.  If you're confused, what you're saying, that that's not a lie?

A.      It's just a matter of how you remember it.

Q.      So, let's talk about what the truth does mean to you then.  All right?  Because that's really the essence of your obligations under the agreement, because if you don't fulfill the agreement, all deals are off; right?

A.      That's correct.

Q.      In other words, if the state decides—if you lie under this agreement, you can be prosecuted—you're not looking at 18 months anymore, you're looking at 125 years; right?

A.      I don't know the exact number, but if you lie, you have to deal with the consequences, what the lie was about.

Q.      And not only could you be charged with perjury, but the immunity provisions go away; right?

A.      I would think so.

. . . .

Q.      So you have to be consistent with your June 13th, 14th, and 15th statements, right, because you signed the agreement on June 17th; right?

A.      Well, you would be consistent after you sign the agreement.

Q.      Right.

A.      Because you might not have been under oath prior to signing the agreement.

Q.      So, in other words, you might've told a different story on June 13th, 14th, and 15th, but if you weren't under oath, that would be okay?

A.      It's not okay, but you didn't lie, because you weren't under oath.

Q.      So if you told a story to the prosecutors that was not true, it would be okay, as long as you weren't under oath?

A.      No necessarily true, but, I mean, you wouldn't be held as far as this plea agreement goes.

. . . .

Q.      So back to what the truth means, you do agree that under the agreement that you signed that the people who get to decide whether you're telling the truth are the prosecutors . . .?

A.      They make the—they make the recommendations to the judge. . . .

(Doc. 8, Ex. B at 680–83).

Defense counsel questioned Mr. Junior about the substantial assistance provision of the plea agreement, whereby the State could file a motion with the court to reduce Mr. Junior's sentence below the sentencing guidelines, and the court had sole discretion to reduce Mr. Junior's sentence

(*see* Doc. 8, Ex. B at 683–85).  Mr. Junior agreed that it was the State's decision as to whether or not he was telling the truth and whether or not he could seek a sentence reduction (*id.* at 685).

During cross-examination, Mr. Junior also admitted, among other things, that when he received the $10,000 check from Petitioner on May 31, 2001, it was a loan to pay off Mr. Junior's tax debt, and it had nothing to do with the Pensacola Soccer Complex (Doc. 8, Ex. B at 694–95). Mr. Junior testified that when he received the loan he had no intention of paying it back because "I knew that some kind of way the money would be dealt with" (*id.* at 699).  He testified that he deemed the loan paid off when Petitioner withheld $25,000 from the pot of money Mr. Junior received from Petitioner in November of 2001 (*id.* at 695–96).  Related to the May 31, 2001 incident, defense counsel cross-examined Mr. Junior about when he first revealed to investigators Petitioner's alleged statement during the incident that Petitioner was "sick and tired of not being able to get three votes":

> Q.      Now, what you said this morning to the ladies and gentlemen of the jury and the court, is there were some words spoken at or around the time that you got the May 31st check, there were some words spoken, there was something that W.D. Childers said to you.  Do you remember that?
>
> A.      Yes.
>
> Q.      And what he said was, that he said something like, words to the effect of, "I'm sick and tired of not being able to get three votes on the commission"; right?
>
> A.      That's correct.
>
> Q.      Now you had been asked repeatedly over a period of seven months about the May 31st check in, I believe, nine separate sworn statements or depositions, and you never ever said that those words were spoken until January of 2003; is that correct?
>
> A.      That's correct.
>
> Q.      Okay, so for the first time on January 17, 2003 in the State Attorney's Office, you said: "He made a statement when he lent me that money, and it was about getting three votes"; right?
>
> A.      I don't remember that.  You're saying that—

Q.      (Interposing) I'm saying that for seven months you never said it, and in January you said it; right?  In January, you told the State Attorney's Office that he said this comment about not getting the three votes?

A.      That was, I think, the first—that was the first—that was the May 31st meeting that that statement was made.

Q.      Right.  But you never told anyone about it until January of 2003; correct?

A.      I'm not certain about that.

Q.      Okay.  Now, I could give you every single one of these depositions and you can start reading them—

A.      (Interposing) No, I don't have to read them, but I'm not sure—I remember him stating that he said he had a problem with getting three votes.

Q.      And you stated that in January of '03 at the State Attorney's Office to Mr. Cotton, the investigator; correct?

A.      I think I stated it before then also.

Q.      To whom?

A.      To Mr. Cotton.

. . . .

Q.      Tell me where.  Give me a year when you said that.

A.      I'm remembering having made that statement more than one time.  I just can't come up with a specific time frame.

Q.      Do you acknowledge that for seven months in all of your depositions and testimony, you never said it, though?

A.      If that's what it states, I'll accept that.

. . . .

Q.      Now, have you now thought about any other time that you've said it to Allen Cotton other than in January of this year?

A.      It spans back a long time.  I don't recall.

Q.      You don't recall when, if at all, you said it to Allen Cotton?

A.      I don't recall.

Q.      Now, this three-vote issue, you've just told us here, you've told the jury, that when that came up was on May 31st of '01, the day of that check, right, May 31st of '01?

A.      Yes.

Q.      But at other times, you have said that the three-vote issue came up when the 100/100 was written down on a piece of paper, that that's when it came up, not at the May 31st meeting; is that right?

A.      I'm not certain.

Q.      Okay.  Well, did you tell Allen Cotton on January 17th of this year that the three-vote issue came up at the time that Mr. Childers wrote the 100,0000/100,000 on the piece of paper, and that's when it was?

A.      I'm not certain.

Q.      But if you told him that on January 17th, you would've been mistaken, because what you're saying now is it came up on May 31st; correct?

A.      I'm not certain.

Q.      You're not certain as to when it came up?

A.      As to when I might've told Allen Cotton.

Q.      In other words, if you told Allen Cotton on January 17, '03 that it came up not on May 31st, but at the time of the 100/100, that would've been incorrect, or you don't know if that would've been incorrect?

A.      Don't know.

Q.      Okay.  So you don't know when it came up?

A.      I don't know when I talked to Allen Cotton about it.

Q.      Well, I'm telling you that it was January 17th.  My question is, were you telling him the truth then or were you mistaken?

A.      I'm not certain.

Q.      And, again, on January 31st when you met with Mr. Cotton again, did you tell him again that it was at the time of the 100/100, not at the time of the May 31st loan that the three-vote issue came up?

A.      As I said earlier, I'm not certain.

Q.      Under oath in June and under oath on numerous depositions and under all your prior testimony under oath prior to January of this year, though, you never, said—I asked you about Cotton, but under oath, you've never said anything about this three-vote issue, had you?

A.      I can't—all of those times I did the deposition, I'm not certain.

(*id.* at 696–706).

Defense counsel then impeached Mr. Junior's testimony with his prior inconsistent statements on several issues.  For example, Mr. Junior testified earlier in Petitioner's trial that the County's purchase of the Soccer Complex was not a good idea, and defense counsel impeached him with his prior statements that the purchase was a good idea, as well as the inconsistent reasons he gave for his opinion (Doc. 8, Ex. B at 709–11).

Additionally, Mr. Junior testified earlier in Petitioner's trial that the "100/100" note incident occurred between August and September of 2001, and defense counsel impeached Mr. Junior with his grand jury testimony that the note incident occurred between October 4 and November 1, 2001, as well as his prior statement to defense counsel that the note incident occurred in July or August of 2001, and his statement to Investigator Robbie Hughes that the note incident occurred after the closing on the Soccer Complex property (Doc. 8, Ex. B at 718–23).  Mr. Junior eventually reverted back to his grand jury testimony that the note incident occurred after he put the appraisal issue on the Commission's agenda on October 4, 2001 (*id.* at 721–22).

Mr. Junior also testified earlier in Petitioner's trial that when Petitioner wrote "100,000/ 100,000" on a legal pad, Petitioner stated he and Mr. Junior would each receive "a hundred," and defense counsel impeached Mr. Junior with his prior deposition testimony and prior testimony in court proceedings in December of 2002 (the Elliott trial) that there was no talk when the note was written (Doc. 8, Ex. B at 747).  Additionally, defense counsel cross-examined Mr. Junior about the fact that he stated during a deposition just two weeks prior to Petitioner's trial that he did not know about the Soccer Complex at the time the "100/100" note was written, but at Petitioner's trial he

testified he was aware of the Soccer Complex issue at the time the note was written (*id.* at 749–50). Mr. Junior also conceded on cross-examination that he said different things at different times about what happened to the "100/100" note after Petitioner wrote it (*id.* at 750–51).

Additionally, defense counsel cross-examined Mr. Junior about his testimony regarding the physical description of the pot that he received from Petitioner, and impeached him with prior inconsistent statements about this subject, including Mr. Junior's testimony during a court proceeding in December of 2002 (the Elliott trial) (Doc. 8, Ex. B at 751–67).  Defense counsel further cross-examined Mr. Junior about the date Petitioner gave him the pot.  Mr. Junior testified earlier in Petitioner's trial that he received the pot on November 24, 2001, but he admitted on cross-examination that he told an investigator on June 13, 2002 that he received the pot the week before Christmas, he also admitted that he told the grand jury that he received it in early December, and then Mr. Junior explained how he arrived at the November 24 date (*id.* at 768–71).  Defense counsel also cross-examined Mr. Junior about his earlier testimony that when Petitioner presented him with the pot, he said "I got 25—25 out."  Defense counsel asked:

> Q.     And isn't it true that for the first time, two months ago, . . . on January 17th, of '03, after ten prior sworn statements, you told Investigator Cotton for the State Attorney's Office that there was conversation when you got the pot; is that true?
>
> A.     That's true, and I'd like to give an explanation.
> . . . .
> A.     And I had stated there was no discussion or no conversation, so therefore, it was just—it was not, to me, a conversation, it was just a statement made.
>
> Q.     Okay.  So what you're saying is, tell the jury, I just want to make sure, that for one, two, three, four, five, six, seven, eight, nine separate sworn statements, when you said that there was no talk, nothing was said, that what you really meant was, "Well, I didn't say anything, but W.D. did, and he said, "'I took $25,000 out'"?
>
> A.     He made the statement, that's correct.
>
> Q.     So in those nine statements, when all the lawyers and prosecutors and judges and investigators were saying was anything said by W.D., by you, by anyone, and you said no, you really meant yes?

> A.      At that time, I was not remembering, and then I remembered that that was the statement that was made, because their thing was, was there a discussion, and to me a statement and a discussion is two different things.
> . . . .
> Q.      Is your testimony here in this court that you didn't remember it for all those nine sworn statements, or is your testimony that you remembered it the whole way, but you just never told anyone, because you thought they were asking whether there was a discussion, and not a statement made, which is it?
>
> A.      I would assume that they were asking was there a discussion.
>
> Q.      And for all of those nine statements, whenever anyone asked, was anything said at that time, you figured nobody was interested in whether or not W.D. said anything to you, when he supposedly gave you this pot filled with cash?
>
> A.      That's correct.
>
> Q.      Well, then why did you change your mind in January and decide maybe you should say something?
>
> A.      No, it was not a matter of saying anything.  It was, was there a discussion, and there was no discussion, there was just a statement made.

(*id.* at 771–74).  After further questioning, Mr. Junior testified that "it just didn't register" that he should tell the prosecutor or investigators that Petitioner made a statement to him when Petitioner gave him the pot of cash (*id.* at 782).  Defense counsel continued:

> Q.      In preparing for your testimony here, did you meet with anyone, and were the same questions asked, and was there ever a time where a tactic or a game plan was devised for what you'd say here in court knowing that you hadn't said this for all those months?
>
> A.      To answer your question, there was no game plan, no tactic.  A lot of times, we would be on different sides of the fence, so I wouldn't say there was a lot of preparation.

(*id.* at 785).

Defense counsel again questioned Mr. Junior about his revelation of new facts less than three months prior to Petitioner's trial:

> Q.      On January 17, 2003, this year in other words, when you told Investigator Allen Cotton for the first time that W.D. Childers told you that he took $25,000 out of the money pot before he gave it to you, isn't it true that Investigator Cotton asked you why all of a sudden are you telling me this now?

A.      I don't know if he asked me the question about why am I telling him that now, but I had gone back and talked to my attorneys and they said whatever the truth was, tell it, and then that's what I told Allen Cotton.

Q.      In other words, in January of '03 your attorneys said, whatever the truth is tell it?

A.      Yes.

Q.      Did you need legal advice to know that?

A.      It was not legal advice.  He was my lawyer and that's what his statement was.

Q.      Okay.  And then after Mr. Cotton said that to you, you couldn't give him an answer, correct?

A.      I'm not sure.

Q.      Yesterday, in other words, he was saying, how come you never said before about the $25,000 and you said, oh, well, because no one ever asked and it was always they said about a conversation, not about a statement that was made.

But when Allen Cotton on January 17th asked you specifically the same question that I did in court yesterday, how come you never said it before, you couldn't give him an answer?

A.      Well, if I didn't give him an answer, I didn't give him an answer.

Q.      You just shrugged your shoulders, right?

A.      I'm not certain.

Q.      Then he said to you at that point after you couldn't give him an answer, "This is going to be a huge problem."  Didn't he say that?

A.      I don't remember that.

Q.      And when you told Mr. Cotton on the same date, January 17th of this year, that when W.D. Childers supposedly wrote the 100/100 note, he also said, "If the deal goes through on the soccer complex, it is $100,000 for you and $100,000 for me."

Mr. Cotton again asked you, "Why did it take you so long to come up with this memory of what happened?"  That's a quote.  And you said—and you couldn't even give him a reason.  Is that true?

      A.     That's true.

(Doc. 8, Ex. B at 823–25).

Defense counsel further attacked Mr. Junior's credibility with questions about promissory notes he signed to transfer to Petitioner the funeral home owned by Mr. Junior; that Petitioner could not enforce the loan agreement, as any security was encumbered; and that he (Mr. Junior) had no intention of paying Petitioner any money (Doc. 8, Ex. B at 842–52).  Defense counsel concluded his cross-examination with questions regarding Mr. Junior's use of the money provided by Petitioner, which included payment of a tax debt, improvements to his home, paying some expenses of the funeral home, buying jewelry and other items for his girlfriend (the jury later heard testimony from Mr. Junior's wife), and purchasing clothing  (*id.* at 858–74).

On redirect examination, Mr. Junior testified that he was more concerned with making money from his vote on purchasing the Pensacola Soccer Complex than whether the purchase was good for the County, and that his vote was bought by Petitioner (Doc. 8, Ex. B at 886).  He testified that he thought Petitioner wrote the "100/100" note shortly after he (Mr. Junior) met Mr. Elliott but before he added the appraisal of the soccer complex to the Commission's agenda (*id.* at 887).  Mr. Junior also testified that there was equity in the funeral home (*id.* at 898–99).  The prosecutor also attempted to rehabilitate Mr. Junior on the inconsistencies in his statements as highlighted by defense counsel on cross-examination.

Defense counsel conducted a limited re-cross and established that Mr. Junior had attempted to sell his funeral home for a couple of years (Doc. 8, Ex. B at 905).  Mr. Junior also acknowledged that the Soccer Complex was appraised for the value of the purchase price (*id.* at 905–06).

State Attorney Investigator Allen Cotton testified regarding phone logs of Petitioner, Mr. Junior, and Mr. Elliott (Doc. 8, Ex. B at 1157–68).  Defense counsel vigorously cross-examined Investigator Cotton regarding his belief as to Mr. Junior's compliance with the terms of the plea agreement:

      Q.     If Junior is a witness at any trial or other hearing, including one in which Junior is the charged defendant and he testifies as to any fact materially

different from statements made or other information provided earlier by Junior under this agreement, the State Attorney may cross-examine Junior or present impeachment evidence concerning any statements made or information provided earlier by Junior under this agreement.  It says that, doesn't it?

       A.     It does say that.

       Q.     In other words, if he changes his story, the State Attorney can nail him on it.  That's what that says, right?

       A.     That is correct.

       Q.     And then it says that this provision is necessary in order to assure that Junior does not make materially false statements to a state agency and does not commit perjury while testifying, right?

       A.     That's the way it reads, yes, sir.
. . . .
       Q.     Right?  There is no question that he's changed his story on various matters along the way, is there?

       A.     He has basically given more information during this investigation, that is correct.

       Q.     Do you agree with me that he's changed his testimony about different things?

       A.     I would say there are some inconsistencies at issue.

       Q.     And the parties agreed under this agreement, that the state may revoke the agreement in the sole discretion of the State Attorney [if] any of the following circumstances have occurred.  Junior's refusal to cooperate by this agreement, right?

       A.     That's correct.

       Q.     His statements are incomplete or untruthful, correct?

       A.     That's the way it reads, yes sir.

       Q.     By the way, an incomplete statement means, one, where the witness does not give the full story about something, that's incomplete?

       A.     Yes sir, I believe that would be a correct summary.

. . . .

       Q.     Okay.  So having testified about this agreement, it's apparent that the language in this agreement was meant to, A, encourage him to tell the truth at the beginning?

       A.     Yes, sir.

       Q.     And B, punish him if he didn't?

       A.     It left the options open to the State Attorney.

       Q.     In other words, he could lose his immunity, the whole thing that we have talked about here?

       A.     That's correct.  It would be up to—in the sole discretion of the State Attorney.

(Doc. 8, Ex. B at 1171–75).

During the presentation of the defense's case, defense counsel called Investigator Cotton to testify regarding his interviews with Mr. Junior in January of 2003:

       Q.     Investigator Cotton, during that interview [on January 17, 2003], did Willie Junior tell you that when Mr. Childers wrote out 100/100 on a piece of paper, that he also said if the deal goes through on the soccer complex, it is 100,000 for you and 100,000 for me?

       A.     Yes, sir, he did tell me that.

       Q.     And did you tell him after he said that, the fact that he was now suddenly remembering something that was supposedly said by W.D. Childers after all that time was going to be a problem for his credibility?

       A.     I did not directly tell him that, no, sir.

. . . .

       Q.     I would like to show you page 168 of your February 3rd of this year deposition, sir, and ask you just read to yourself beginning at line 7 through 15. . . . If you would look at page 170, line 7 through 15 and just read it to yourself.

       A.     Yes, sir.  After reviewing my deposition and thinking back, I did tell him basically that this was different from what he's told us in the past, and—

       Q.     So you said it was a big problem for his credibility?

       A.     Well, any time you add to or take away, it becomes a problem.

Q.      And that's what you told him?

A.      Yes, sir.

Q.      And he acknowledged that?

A.      Yes, sir.

Q.      Did you ask him why he waited so long to tell you this information?

A.      I did.

Q.      And was he able to give you an answer?

A.      To my recollection, no, sir, he could not give me an answer.

Q.      During that same interview, did Mr. Junior also tell you that . . . Mr. Childers told him he had taken 25,000 out of the pot prior to giving it to him?

A.      Yes, sir.

Q.      Was that the first time that you had heard that from Willie Junior at all?

A.      From Willie Junior?  Yes, sir.

Q.      Did you also say to him after he made that statement, why all of a sudden are you telling me this now?

A.      Yes, sir.

Q.      Was he able to give you an answer when you asked him this?

. . . .
A.      No, sir, he was not able to give me an answer.

(Doc. 8, Ex. B at 1244–46).  On cross-examination, the State elicited testimony that Mr. Junior had always been consistent regarding the fact that Petitioner wrote the "100/100" note and that Mr. Junior had received money from Petitioner placed in a pot (*id.* at 1250, 1252).

Petitioner argues that preclusion of the verdict in the Elliott trial, the State's Notice of Revocation of Willie Junior's plea agreement, and statements by the State Attorney during the hearing on the State's Notice of Revocation regarding the State's reasons for seeking revocation of

the plea agreement rendered cross-examination constitutionally inadequate for two reasons.  First, the limitation prevented the jury from learning about Mr. Junior's motivation in forming his testimony, specifically, that Mr. Junior was motivated to bolster his story by the acquittal in the Elliott trial and the State's seeking to revoke his plea agreement (*see* Doc. 1, Supporting Memorandum at 2–3, 12, 19–20; Doc. 17 at 9).  Second, the limitation actually misled the jury about Mr. Junior's credibility in that Mr. Junior acknowledged on the stand that the State had the power to revoke his plea agreement if he was untruthful, but because the State in fact did not have that power—given that the trial judge was able to block that effort—the jury was misled to believe that the State believed Mr. Junior was "telling the same story" at Petitioner's trial as he had told at the Elliott trial (*see* Doc. 1, Supporting Memorandum at 3; Doc. 17 at 9–10).

Despite the trial court's preclusion of the verdict in the Elliott trial, and the State's Notice of Revocation and statements by the State Attorney during the hearing on the Notice of Revocation, the defense was able to present evidence of the following:  (1) some of the facts to which Mr. Junior was testifying were first revealed by Mr. Junior to the State Attorney just three months prior to Petitioner's trial, (2) Mr. Junior had not previously provided this information in his testimony in a judicial proceeding in December of 2002, his grand jury testimony in June of 2002, previous depositions in 2002 and 2003, or statements to State Attorney investigators, (3) State Attorney Investigator Cotton believed that Mr. Junior's revelation of new facts was problematic in terms of Mr. Junior's credibility, (4) Mr. Junior could not give Investigator Cotton a reason for not previously disclosing the new facts, but Mr. Junior was able to provide reasons in his testimony at Petitioner's trial, and (5) Mr. Junior was highly motivated to please the prosecutor since the prosecutor had sole discretion to file a substantial assistance motion which would give the sentencing court discretion to reduce Mr. Junior's sentence below the sentencing guidelines.  Furthermore, defense counsel was able to argue the following during closing arguments:  (1) Mr. Junior's hope that the prosecutor would grant him immunity from prosecution for other crimes and make the appropriate recommendations in his criminal case, which would enable him avoid actual felony convictions and receive a probationary sentence instead of 125 years in prison, motivated him to change his story in January of 2003 to match up with the State's other evidence, (2) after State Attorney Investigator Cotton told Mr. Junior in January of 2003 that Mr. Junior had a big problem with his credibility, Mr.

Junior developed excuses for not previously disclosing the new facts until January of 2003, (3) if Mr. Junior did not change his facts to fit the State's theory and the other evidence, he could not have testified at Petitioner's trial that Petitioner bribed him, (4) it was unbelievable to think that the State Attorney would recommend a lenient sentence for Mr. Junior if Mr. Junior did not "perform" at Petitioner's trial and instead reverted to his original story, (5) part of Mr. Junior's "deception" was that every time he got "nailed" on something, he fell back to his alternative position that he did not remember or "if that's what I said, I said," (6) Mr. Junior was "sneaky and deceptive" by testifying in "double-talk," (7) on cross-examination, Mr. Junior admitted that he had not told the truth to the jury regarding at least one issue, (8) Mr. Junior lied during his testimony to convince the jury that checks he received from Petitioner were bribes not loans, (9) when the State drafted Mr. Junior's plea agreement, "They knew the guy was a liar," so they included the provision that they could impeach him with prior inconsistent statements to prevent him from committing perjury, but they did not exercise this right at Petitioner's trial and left it to the defense to bring out Mr. Junior's inconsistencies, (10) the State did nothing to assure that Mr. Junior testified truthfully at Petitioner's trial, and (11) the considerations for determining whether Mr. Junior was credible, including whether he made inconsistent statements, whether he was offered any benefit for his testimony, and whether he seemed to have an accurate memory, weighed against his credibility (*see* Doc. 8, Ex. B at 1556–1619, 1625–27, 1645).

Although the defense was not able to argue to the jury that the acquittal in the Elliott trial in December of 2002 motivated Mr. Junior to come forward with new facts in January of 2003, and the State's seeking revocation of the plea agreement motivated him to stick to this new story, defense counsel was able to argue that Mr. Junior was motivated to bolster his testimony with new facts that matched up with the State's other evidence out of fear that if he did not do so and reverted back to his old story, he would not receive a positive sentence recommendation from the State Attorney.  Thus, defense counsel was able to expose to the jurors the facts from which they could appropriately draw inferences relating to Mr. Junior's reliability, including his motivation for testifying as he did.  *See* Van Arsdall, 475 U.S. at 680.  Additionally, the testimony and cross-examination of Mr. Junior did not suggest to the jury that the State believed that he told the same story at Petitioner's trial that he previously told, and any suggestion to this effect was refuted by

State Attorney Investigator Cotton's testimony that portions of Mr. Junior's story had not been revealed to the State by Mr. Junior until January of 2003, only three months prior to Petitioner's trial and after months of depositions, interviews, and judicial proceedings. Moreover, the jury heard the terms of Mr. Junior's plea agreement, the particularities of the inconsistencies in Mr. Junior's statements, and testimony regarding his failure to disclose certain information until just prior to Petitioner's trial, which formed the basis for the State's Notice of Revocation and the State Attorney's statements during the hearing on the Notice, and the jury heard evidence that the State Attorney was aware of those inconsistencies and omissions in Mr. Junior's statements prior to Petitioner's trial (per the testimony of State Attorney Investigator Cotton). Therefore, the jury was aware of the substance of the Notice of Revocation and the State Attorney's reasons for filing it. Furthermore, had the trial court admitted the Notice of Revocation and evidence of the State's reasons for seeking the revocation, the impeachment value of the evidence may have been limited or diminished by the fact that the State may have been permitted to present the court's decision denying the State's request to revoke Mr. Junior's plea agreement and finding that Mr. Junior had substantially complied with the terms of the agreement.[2]  Although the jury was not aware that the State actually sought revocation of the plea agreement, thus possibly motivating Mr. Junior to bolster his story, they were aware that the threat of the State's doing so existed and possibly motivated Mr. Junior to bolster his story.

Petitioner has failed to demonstrate that he was prevented from eliciting sufficient information from which (1) the jury could gauge Mr. Junior's credibility, motive, and bias and (2) his counsel could argue to the jury how Mr. Junior might have been biased or motivated to testify as he did. Indeed, the undersigned concludes that the excluded testimony would not have given the jury a different impression of Mr. Junior's credibility. Thus, the trial court's foreclosure of cross-examination "in whatever way, and to whatever extent, the defense might wish" simply did not rise to the level of denying the defense an opportunity for effective cross-examination of Mr. Junior. *See* Fensterer, 474 U.S. at 20. Additionally, the preclusion did not prevent Petitioner from presenting

---

[2]Presenting the substance of the Notice of Revocation through the trial testimony, as opposed to admitting the actual notice, effectively eliminated any risk to Petitioner that the jury would learn of the trial court's findings on the matter.

his defense.  The jury heard all the relevant details of the charged offenses from Petitioner's perspective through his own testimony, and the trial court's rulings at issue in this case did not preclude him from introducing any factual evidence about the crimes themselves.  Therefore, the trial court's rulings did not violate Petitioner's Sixth Amendment right or unconstitutionally abridge his right to present a defense.

Accordingly, it is **ORDERED**:

Petitioner's motion to expedite the proceedings and supplement the record (Doc. 20) is **GRANTED IN PART**.  The motion is **GRANTED** only to the extent that the record is expanded to include the transcripts attached to Petitioner's motion, and the undersigned has considered those materials to the extent they are relevant to the court's analysis of Petitioner's claim.  The motion is **DENIED** as moot to the extent Petitioner seeks expedited review of his petition.[3]

And it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

At Pensacola, Florida, this 24th day of July 2008.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

---

[3]Petitioner's age and the length of his sentence are not sufficient grounds to justify expedited review of case. This case came up for review during the normal course of the court's docket a few days after the parties completed briefing of the motion to expedite the proceedings and supplement the record.  The undersigned has not reviewed this case more quickly than it would have if Petitioner had not filed the motion to expedite.